IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
COOKEVILLE DIVISION

MARK GARRETT, )
 )
Plaintiff, )
 )
 ) NO. 2:05-0122
 ) JUDGE HAYNES
LINCARE, INC d/b/a UNITED )
MEDICAL, )
 )
Defendant. )

## MEMORANDUM

Plaintiff, Mark Garrett, originally filed this action in the Circuit Court of Overton County against the Defendant Lincare, Inc., doing business as United Medical ("Lincare"). Plaintiff asserts a state law claim of retaliatory discharge arising out of the Defendant's termination of his employment allegedly due to Plaintiff's medical condition and his related filing of a claim for workers' compensation benefits.

Before the Court is the Defendant's motion for summary judgment (Docket Entry No. 11) contending, in sum, that Plaintiff's claim is time-barred because under Tennessee law the applicable one-year statute of limitations commences when an employee receives notice of the termination of his employment. In addition, Lincare contends that Plaintiff was terminated for legitimate business reasons, namely, his undisputed failure to report an accident in his company vehicle, as required by company policy. The Defendant argues that this reason is unrelated to Plaintiff's worker's compensation claim.

In his response, Plaintiff contends the limitations period should be tolled and the equitable estoppel doctrine applied because after his discharge, he received a copy of an e-mail from an "anonymous" source that reflects that his worker's compensation claim was the "real reason" for his

discharge.

## A. Finding of Facts[1]

As pertinent here, Plaintiff worked as a carpenter with Eagle Medical, Lincare's successor and later as a service representative for Lincare at its Livingston, Tennessee office. (Docket Entry No. 11, Exhibit A, Dilley Affidavit at ¶ 3 and Exhibit H, Garrett Deposition at p. 18). On November 17, 2003, while driving a company van, Plaintiff backed the company vehicle into the fence of a Lincare customer. Id. at Exhibit C, Layton Affidavit at ¶¶ 4, 5 and Exhibit H, Garrett Deposition at p. 25. Plaintiff did not report this accident to the company until two days later. Id. at Exhibit C Layton Affidavit at ¶¶ 4, 5 and Exhibit H, Garrett Deposition at pp. 22-23, 26. The customer, however, reported the accident to the Defendant's Livingston center on November 18th. Id. at Exhibit F, Morgan Affidavit at ¶ 3.

On Wednesday, November 19th, Darrell Layton, Lincare's local manager, informed Sheila Dilly, Lincare's local human resources manager about this incident and inquired, "How should we handle this? Written warning or termination." Id. at Exhibit C, Layton Affidavit at ¶ 4. Dilley consulted with Debbie Lewis, Lincare's National Safety Manager, who responded:

> It's up to you as to the way to handle this. He did not report this incident to his manager per policy even though he had ample opportunity to do so before the patient called the center. He may try to relate it to the w/c situation, but it should be totally separate from it. Not reporting an accident is grounds for termination per

---

[1] Upon a motion for summary judgment, the factual contentions are viewed in the light most favorable to the party opposing the motion for summary judgment. Duchon v. Cajon Co., 791 F.2d 43, 46 (6th Cir. 1986). As discussed infra, upon the filing of a motion for summary judgment, the opposing party must come forth with sufficient evidence to withstand a motion for directed verdict, Anderson v. Liberty Lobby, 477 U.S. 242, 247-52 (1986), particularly where there has been an opportunity for discovery. Celotex Corp. v. Catrett, 477 U.S. 317, 326 (1986). The Court concludes that there are factual disputes, but under the applicable law, these disputes are not material. Thus, this section constitutes finding of facts under Fed.R.Civ.P. 56(d).

2

policy. Let me know how you proceed. Thanks.

Id. at Exhibit B, Lewis Affidavit at ¶ 3.

Lincare's employee handbook has a section on employee accidents and reports thereon and that policy provides, in pertinent part:

> Examples of major infractions, as listed below, . . . may result in termination without written notice and without prior warning or progressive discipline. . . Violations of the vehicle discipline policy, including . . . [f]ailure to report an accident or injury within 24 hours of the occurrence.

Id. at Exhibit 1, Dilley Affidavit at ¶ 4.

On Thursday, November 20th, after consulting with Lewis, Dilley decided that Plaintiff should be terminated based on the violation of the company's vehicle discipline policy, namely "failure to report an accident or injury within 24 hours of the occurrence." Id. at ¶ 5. Dilley prepared the "Termination Notice" that was delivered to Plaintiff on Friday, November 21, 2003. Masters, the local manager, signed and delivered the following notice of termination.

> This letter is to inform you that your employment with UMI/Lincare as a Service Representative is being terminated effective today.
>
> It had come to our attention on November 18th that you had an accident while at a patient's home after the patient had called to inquire when they could expect for their fence to be repaired. You had not notified me of any such accident.
>
> By not reporting this accident you violated on e of UMI/Lincare's vehicle discipline policies, which is a Major Infraction and grounds for termination:
> **VIOLATIONS OF THE VEHICLE DISCIPLINARY POLICY**
> • **Failure to report an accident or injury within 24 hours of the occurrence.**

Id. at ¶ 7, attachment thereto, Exhibit 2 termination letter.

Plaintiff appealed his termination, and in a letter dated December 1, 2003, Bill Warren, Lincare's regional manager, reported on his investigation of the accident and wrote:

> The issue at hand is a major violation of Lincare's safety policy, not reporting a vehicle accident within 24 hours of the occurrence.
>
> The problem remains that even though you felt that there was no damage the owner of the property and fence called our center and filed a claim of damages of $300. This is a major infraction as defined in the "About Your Company Handbook" . . . Because you did not report this accident within 24 hours I must uphold the decision to terminate your employment.

Id. at Exhibit E, Warren Affidavit at ¶ 3, attachment thereto, Exhibit 1.

Plaintiff applied for unemployment compensation benefits, but his application was denied.

On appeal, Plaintiff's counsel questioned him about his discharge.

> Thurman: Had you been notified before this [November 17, 2003] incident occurred that you very will might be terminated from employment?
>
> Garrett: Yes
>
> \* \* \*
>
> Thurman: Who told you that?
>
> Garrett: Mr. [Brett] Masters.
>
> Thurman: What reason did he tell you that you might be terminated?
>
> Garrett: Well, this is going into where, you know, with my back injury. It's my - it started about July [2003] after I had my back surgery for about six months. <u>He would take me in the office and shut the door and tell me that if I didn't get well soon, that they were gonna [sic] fire me. And then go to the doctor in August - if you're not better by the end of the month, we're getting rid of you</u>. And them come September, we're getting rid of you. We've got to have somebody to do the job. We've go to - we can't have somebody else coming from another center doing your job. And we've got to get rid of you.

Id. at Exhibit G at 36-37. (emphasis added).

At the Appeals Tribunal hearing, Plaintiff conceded his opportunity to inform Lincare of the accident shortly thereafter, but he failed to do so.

> Masters: That afternoon on Monday, [November 17, 2003], did you have the opportunity to tell me that you had a vehicle accident when you left the

4

> warehouse and I was there talking to you? Did you have that opportunity?
>
> Garrett: I had the opportunity to tell you that I had backed into a fence and scuffed the vehicle. . . .

Id. at 38.

In its January 19, 2004 decision, the Appeals Tribunal denied Plaintiff's unemployment compensation benefits claim.

> Employer policy calls for discharge if an employee fails to report an accident within twenty-four hours. Claimant was aware of the policy. Claimant backed into a customer's fence while delivering some medical supplies. He notified the customer and because the damage was minor, the customer told him not to worry about it. There was a scratch and four inch crease made in the side of the van when claimant hit the fence post. Claimant intentionally did not report the accident to the employer. Later the customer looked at the fence and felt that the company should pay for the damage. She called and spoke with claimant's supervisor who investigated.
>
> * * *
>
> The evidence establishes that the claimant was discharged after he failed to report an accident. . . . [C]laimant admits that he had no intentions of reporting the accident . . . [T]here was damage to the company van . . . Claimant was aware of the company policy. The policy is a common one that is based upon reasonable expectations. Claimant argues that he was discharged because of an earlier injury to his back. There is no evidence to support claimant's theory. The incident that preceded claimant's discharge was his violation of a known company policy. The claimant owed employer the duty to report his accidents. Claimant violated the duty owed to the employer. There is evidence of work-related misconduct.

Id. at 23-24.

In his appeal to the Board of Review, Plaintiff asserted that his discharge was actually due to his medical condition:

> When I went back to work [after may back injury on January 13, 2003], Brett Masters told me that if I didn't get my back well, the company would fire me. . . . I truly believe that I was dismissed because of my back problem, and not the [November 17, 2003] accident . . .

Id. at 22. (emphasis added).

On September 12, 2003, Plaintiff filed his workers' compensation action in state court based upon his back condition. In that action, Plaintiff testified:

> Q. [D]id you have any other problems at work whereas you were getting in trouble for not being able to do the job?
>
> A. Because of the limitations that I was on.
>
> Q. Yeah, that would be one reason?
>
> A. Yes.
>
> Q. What kind of problem?
>
> A. Well, Mr. Masters, the boss, he repeatedly told me that if I couldn't do my job they were going to fire me.

Id. at Exhibit H, Garrett Deposition at pp. 21-22.

In this action, Plaintiff asserts that he "did not discover the true reason for his discharge until he received on June 20, 2005 . . . an anonymous letter containing Darrell Layton's email to Brett Masters dated November 17, 2003." (Docket Entry No. 1, attachment thereto, Exhibit 1, Complaint ¶ 20). This disputed "Anonymous" e-mail allegedly involved Darrell Layton, Brett Masters and Mike Collins and is dated November 17, 2003, when Masters was the Livingston Center Manger, and Collins was the manager of Lincare's Cookeville office. (Docket Entry No. 11 at Exhibit C, Layton Affidavit at ¶¶ 3 and 6). According to this e-mail, at 9:31 a.m., Masters e-mailed Collins with a copy to Layton:

> Mike I assume after talking to Darrell [Layton], we are to do Liquid ourselves at our center. Stacia signed paperwork when hired to do all phases of job description. And Mark [Garrett] can lift up to 50 lbs. So with that said, Stacia can do Liquid and Mark can assist her on runs that require a lot going upstairs. My only worry if one weights up to 160 lbs, then half that is 80 lbs, and then that would give Mark a reason

6

to say he is hurt. We will handle it so you don't have to keep sending your staff to do our job. Unless Mark gets hurt again, then I guess that is when I will let Darrell decide on next step. Do you think that is all right [sic]? I appreciate all the hel[p] you have give us. Thanks, Brett.

Id. at Exhibit D, Collins Affidavit at ¶ 4(a).

A second e-mail was purportedly sent by Layton on "Monday, November 17, 2003 10:11 a.m. Id. at ¶ 3 and Exhibit C, Layton Affidavit at ¶ 6, but Layton states that on the morning of November 17, 2003, he was driving from Jonesboro, Arkansas to Nashville, Tennessee and could not have sent any e-mail at that time. Id. at Exhibit C, Layton Affidavit at ¶ 6.

In any event, at 11:02 a.m., Collins allegedly reported to Masters: "I HAD NOT HEARD ANYTHING ABOUT THIS, I SURE HOPE STACIA CAN HANDLE THIS, IT WOULD BE BAD IF SHE GOT HURT." Id. at Exhibit D, Collins Affidavit at ¶ 4(b). At 11:48 a.m., Masters forwarded an e-mail to Layton that reads as follows:

> Darrell, Stacia said she can and will do the liquid, if Mark [Garrett] helps her on the heavier runs. Mark doesn't want to do this, he says that half is too much. Today, Stacia has a run that will require help. As you said this has to stop and we must be able to do our own patients. I am trying to work it out so Mike [Collins] and his [Cookeville] staff do their own patients as well. Does this way satisfy you? Let me know, in order to keep everyone working, they need to do their job requirements or at least half. Thanks, Brett.

Id. at Exhibit C, Layton Affidavit at ¶ 7.

At 12:11 p.m., Layton responded with the following e-mail to Masters and Collins:

> Brett and Mile, I think your thoughts are well in trying to let Cookeville have their tech back full time, but it may be a bit too soon. My concern is that we do not want to place Mark [Garrett] in a position to lift more than ordered by a doctor. Considering this, let's leave it as is for now. I am working on something to solve the problem. I know Cookeville spends some time each week servicing your liquid. This places more expectations on Steven. Eventually, each center will have to take care of its own, but we must do this the right way. Mark has a doctor's appointment tomorrow. Hopefully his doctor will increase his weight limit for lifting. If so, then

7

the plan below may work.

> I see only three alternatives to ensuring each center is self sufficient.
>
> 1.) Mark get healthy enough to allow for he and Stacia to do the liquid for Livingston. Through time, if it is a given that Mark will never be able to help with liquid, through doctors orders or permanent disability then the two following options are available.
>
> 2.) The thought of transferring techs from each center could be an option (which I know neither tech from either center wants to transfer either way).
>
> 3.) Transfer all liquid to Cookeville, making Cookeville a FDA center, and losing the FDA title for the Livingston center.
> Thus far those are the only three options I have available for self sufficiency. Can you thing of any other alternatives?

Id. at ¶ 8 and Exhibit C, Collins Affidavit at ¶ 4(c).

The Defendant contends that the prior quoted e-mail from Mr. Layton's 12:11 p.m. email was altered to add the following paragraph, between number one and two, to the "Anonymous" e-mail that is attached to Plaintiff's complaint:

> Through time, if it is a given that Mark will never be able to help with liquid, through doctors orders or permanent disability, then you need to start documenting on Mark and lets get him out of the way because he will definitely cost your center and my area a lot down the road since he has filed workers comp. Brett, Mark is a high liability, find a way, write him up 3 times, I will back you, fire him and get him gone. I will be so happy and I will rejoice when you fire him. He deserves it, because you as well as myself know he is faking it. And that would release a lot [sic] of monies to get another employee hired at a lower cost or what we hire him in at and also will allow me funds to apply elsewhere in my area, and allow for your center employees to make more or share less on Bonuses!!!!!!

(Docket Entry No. 1, Attachment 1, Complaint at Exhibit A thereto).

### B. Conclusions of Law

"The very reason of the summary judgment procedure is to pierce the pleadings and to assess

8

the proof in order to see whether there is a genuine need for trial." Advisory Committee Notes on Rule 56, Federal Civil Judicial Procedure and Rules (West Ed. 1989). Moreover, "district courts are widely acknowledged to possess the power to enter summary judgment sua sponte, so long as the opposing party was on notice that she had to come forward with all of her evidence." Celotex Corp. v. Catrett, 477 U.S. 317, 326 (1986). Accord, Routman v. Automatic Data Processing, Inc., 873 F.2d 970, 971 (6th Cir. 1989).

In Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986), the United States Supreme Court explained the nature of a motion for summary judgment:

> Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment 'shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.
>
> As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.

477 U.S. at 247-48 (emphasis in the original and added in part). Earlier the Supreme Court defined a material fact for Rule 56 purposes as "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita Electrical Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citations omitted).

A motion for summary judgment is to be considered after adequate time for discovery. Celotex Corp. v. Catrett, 477 U.S. 317, 326 (1986). Where there has been a reasonable opportunity for discovery, the party opposing the motion must make an affirmative showing of the need for

9

additional discovery after the filing of a motion for summary judgment. Emmons v. McLaughlin, 874 F.2d 351, 355-57 (6th Cir. 1989). But see Routman v. Automatic Data Processing, Inc., 873 F.2d 970, 971 (6th Cir. 1989).

There is a certain framework in considering a summary judgment motion as to the required showing of the respective parties as described by the Court in Celotex

> Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact. . . . [W]e find no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials negating the opponent's claim.

Celotex, 477 U.S. at 323 (emphasis deleted).

As the Court of Appeals explained, "[t]he moving party bears the burden of satisfying Rule 56(c) standards." Martin v. Kelley, 803 F.2d 236, 239, n. 4 (6th Cir. 1986). The moving party's burden is to show "clearly and convincingly" the absence of any genuine issues of material fact. Sims v. Memphis Processors, Inc., 926 F.2d 524, 526 (6th Cir. 1991)(quoting Kochins v. Linden-Alimak, Inc., 799 F.2d 1128, 1133 (6th Cir. 1986)). "So long as the movant has met its initial burden of 'demonstrating the absence of a genuine issue of material fact,' the nonmoving party then 'must set forth specific facts showing that there is a genuine issue for trial.'" Emmons v. McLaughlin, 874 F.2d 351, 353 (6th Cir. 1989) (quoting Celotex and Rule 56(e)).

Once the moving party meets its initial burden, the Court of Appeals warned that "[t]he respondent must adduce more than a scintilla of evidence to overcome the motion [and]. . . must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479 (6th Cir. 1989)(quoting Liberty Lobby).

10

Moreover, the Court of Appeals explained that

> The respondent must 'do more than simply show that there is some metaphysical doubt as to the material facts.' Further, '[w]here the record taken as a whole could not lead a rational trier of fact to find' for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is 'implausible.'

Street, 886 F.2d at 1480 (cites omitted).

If both parties make their respective showings, the Court then determines if the material factual dispute is genuine, applying the governing law.

> More important for present purposes, <u>summary judgment will not lie if the dispute about a material fact is 'genuine' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party</u>.
>
> \* \* \*
>
> Progressing to the specific issue in this case, we are convinced that <u>the inquiry involved in a ruling on a motion for summary judgment or for a directed verdict necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits</u>. If the defendant in a run-of-the-mill civil case moves for summary judgment or for a directed verdict based on the lack of proof of a material fact, <u>the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented</u>. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. <u>The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict -- 'whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed</u>.'

Liberty Lobby, 477 U.S. at 248, 252 (citation omitted and emphasis added).

It is likewise true that

> [I]n ruling on a motion for summary judgment, the court must construe the evidence in its most favorable light in favor of the party opposing the motion and against the movant. Further, the papers supporting the movant are closely scrutinized, whereas the opponent's are indulgently treated. It has been stated that:

11

> 'The purpose of the hearing on the motion for such a judgment is not to resolve factual issues. It is to determine whether there is any genuine issue of material fact in dispute. . . .'

<u>Bohn Aluminum & Brass Corp. v. Storm King Corp.</u>, 303 F.2d 425, 427 (6th Cir. 1962) (citation omitted). As the Court of Appeals stated, "[a]ll facts and inferences to be drawn therefrom must be read in a light most favorable to the party opposing the motion." <u>Duchon v. Cajon Company</u>, 791 F.2d. 43, 46 (6th Cir. 1986) <u>app.</u> 840 F.2d 16 (6th Cir. 1988) (unpublished opinion) (citation omitted).

The Court of Appeals further explained the District Court's role in evaluating the proof on a summary judgment motion

> A district court is not required to speculate on which portion of the record the nonmoving party relies, nor is it obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim. Rule 56 contemplates a limited marshalling of evidence by the nonmoving party sufficient to establishing a genuine issue of material fact for trial. This marshalling of evidence, however, does not require the nonmoving party to "designate" facts by citing specific page numbers. Designate means simply "to point out the location of." <u>Webster's Third New InterNational Dictionary</u> (1986).
>
> Of course, the designated portions of the record must be presented with enough specificity that the district court can readily identify the facts upon which the nonmoving party relies; but that need for specificity must be balanced against a party's need to be fairly apprised of how much specificity the district court requires. This notice can be adequately accomplished through a local court rule or a pretrial order.

<u>InterRoyal Corp. v. Sponseller</u>, 889 F.2d 108, 111 (6th Cir. 1989). Here, the parties have given some references to the proof upon which they rely. Local Rule 8(b)(7)(A) and (C) require a showing of undisputed and disputed facts.

In <u>Street</u>, the Court of Appeals discussed the trilogy of leading Supreme Court decisions,

and other authorities on summary judgment and synthesized ten rules in the "new era" on summary judgment motions

> 1. Complex cases are not necessarily inappropriate for summary judgment.
>
> 2. Cases involving state of mind issues are not necessarily inappropriate for summary judgment.
>
> 3. The movant must meet the initial burden of showing 'the absence of a genuine issue of material fact' as to an essential element of the non-movant's case.
>
> 4. This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.
>
> 5. A court should apply a federal directed verdict standard in ruling on a motion for summary judgment. The inquiry on a summary judgment motion or a directed verdict motion is the same: 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that the party must prevail as a matter of law.'
>
> 6. As on federal directed verdict motions, the 'scintilla rule' applies, i.e., the respondent must adduce more than a scintilla of evidence to overcome the motion.
>
> 7. The substantive law governing the case will determine what issues of fact are material, and any heightened burden of proof required by the substantive law for an element of the respondent's case, such as proof by clear and convincing evidence, must be satisfied by the respondent.
>
> 8. The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'
>
> 9. The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.
>
> 10. The trial court has more discretion than in the 'old era' in evaluating the respondent's evidence. The respondent must 'do more than simply show that there is some metaphysical doubt as to the material facts.' Further, '[w]here the record taken as a whole could not lead a rational trier of fact to find' for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is 'implausible.

13

Street, 886 F.2d at 1479-80.

The Court has distilled from these collective holdings four issues that are to be addressed upon a motion for summary judgment: (1) has the moving party "clearly and convincingly" established the absence of material facts?; (2) if so, does the plaintiff present sufficient facts to establish all the elements of the asserted claim or defense?; (3) if factual support is presented by the nonmoving party, are those facts sufficiently plausible to support a jury verdict or judgment under the applicable law?; and (4) are there any genuine factual issues with respect to those material facts under the governing law?

In this diversity action, the District Court must apply the law of the forum. Erie Railroad Co. v. Tompkins, 304 U.S. 64 (1938). In addition, the conflict law of the forum determines which state's substantive law shall apply. Klaxon Co. v. Stentor Electric Mfg., 313 U.S. 487 (1941). Under Tennessee law, for tort claims, Tennessee has adopted the "most significant relationship" test. Hataway v. McKinley, 830 S.W.2d 53, 59 (Tenn. 1992). Here, the parties argue and the Court agrees that Tennessee law is the controlling law in this action.

Here, the applicable Tennessee statute of limitations is Tenn. Code Ann. § 28-3-104 that sets a one year period of limitations for Plaintiff's retaliatory discharge claim. As to when the applicable limitation period commences, in a series of decisions beginning with McCroskey v. Bryant Air Conditioning Co., 524 S.W2d 487, 491 (Tenn. 1975), Tennessee courts apply the reasonable discovery rule. Under this rule, the applicable statute of limitation does not commence until an injury occurs or is discovered or until a reasonable person exercising due diligence should have discovered an injury or a legal claim. Foster v. Harris, 633 S.W.2d 304, 305 (Tenn. 1982); Gibson

14

v. Lockwood Products, 724 S.W.2d 756, 758 (Tenn. Ct. App. 1986); Hathaway v. Middle Tennessee Anesthesiology, P.C., 724 S.W.2d 355, 360 (Tenn. Ct. App. 1986); Woods v. Sherwin-Williams Co., 666 S.W.2d 77, 80 (Tenn. Ct. App. 1983).

Initially, in Foster the Tennessee Supreme Court described this discovery as involving two components.

> It is axiomatic that no judicial remedy was available to this plaintiff until he discovered, or reasonably should have discovered: (1) the occasion, the manner and means by which a breach of duty occurred that produced his injury; and (2) the identity of the defendant who breached the duty.

633 S.W.2d at 305.

Since Foster, Tennessee's statute of limitations is deemed tolled "only during the period when the plaintiff has no knowledge at all that a wrong has occurred, and as a reasonable person is not put on inquiry." Hoffman v. Hospital Affiliates, Inc., 652 S.W.2d 341, 344 (Tenn. 1983). The Tennessee Supreme Court later explained the statute of limitations commences "when the injury occurs or is discovered, or when in the exercise of reasonable care and diligence it should have been discovered." Potts v. Celotex Corp. 796 S.W.2d 678, 680 (Tenn. 1990). In Potts, the Tennessee Supreme Court stated that:

> The discovery rule applies only in cases where that plaintiff does not discover and reasonably could not be expected to discover that he had a right of action. Furthermore, the statute is tolled only during the period when the plaintiff had no knowledge at all that the wrong had occurred and as a reasonable person was not put on inquiry.

Id. at 680-81.

Under Tennessee law, "[a] claim for retaliatory discharge is a tort action which is governed by the general tort statute of limitations which requires that a lawsuit be 'commenced within one (1)

15

year after the cause of action accrue.'" Weber v. Moses, 938 S.W.2d 387, 393 (Tenn. 1996) (quoting Tenn. Code Ann. § 28-3-104). Under Tennessee law, a retaliatory discharge claims "accrue[s] and the statute of limitations begins to run when the employee is given unequivocal notice of the employer's termination decision." Fahrner v. SW Mfg., Inc., 48 S.W.3d 141, 144 (Tenn. 2001) (citing Weber, 938 S.W.2d at 391-93). As the Tennessee Supreme Court stated:

> The rationale of Weber is simply that an employee "discovers" that an injury has been sustained for purposes of the statute of limitations when the employer provides unequivocal notice of the adverse employment action - in this case, termination. At this point, of course, the employee may not know the true reason for the employer's adverse employment decision, or other facts that would tend to show the employer has behaved unlawfully. <u>"We have stressed, however, that there is no requirement that the plaintiff actually know the specific type of legal claim he or she has, or that the injury constituted a breach of the appropriate legal standard." Rather, the employee, through his lawyer, must investigate the circumstances surrounding the employer's decision, and he has the time given to him by the legislature to complete this investigation and then file a complaint - in this case, one year</u>. As another court put it, "when an employee knows that he has been hurt ad also knows that his employer has inflicted the injury, it is fair to begin the countdown toward repose."

Id. at 144-45 (quoting Kohl & Co. P.C. v. & Ewing, 977 S.W.2D 528, 532-33 (Tenn. 1998) and Morris v. Gov. Dev. Bank of Puerto Rico, 27 F.3d 746, 750 (1st cir. 1994) with emphasis added).

In Weber, the Tennessee Supreme Court added that "[w]hile a prerequisite to the running of the statute of limitations is plaintiff's reasonable knowledge that an injury has been sustained, a plaintiff is not entitled to delay filing until all injurious effects or consequences of the actionable wrong are fully known." 938 S.W.2d at 393 (citation omitted). "'[T]he proper focus is on the time of the *discriminatory* act, not the point at which the *consequences* of the act become painful.'" Id. at 391 (quoting Chardon v. Fernandez, 454 U.S. 6, 8 (1981)(emphasis in the original).

Here, Plaintiff received unequivocal written notice of the termination of his employment on November 21, 2003. Moreover, Plaintiff's statements in his unemployment compensation

16

proceeding reflect his awareness that his termination was related to his medical condition. On September 13, 2003, Plaintiff had filed his state workers' compensation action citing his medical condition. In his unemployment compensation appeal on January 26, 2004, the Plaintiff asserted, "I truly believe that I was dismissed because of my back problem, and not the [November 17, 2003] accident." (Docket Entry No. 11, Exhibit G at p. 22). During his unemployment compensation hearing on January 8, 2004, the Plaintiff also testified that, after he hurt his back on January 13, 2003 and could not lift heavy objects, his immediate supervisor, Masters, "would take me in the office and shut the door and tell me that if I didn't get well soon that they were gonna fire me." Id. at 37. In his September 9, 2004, deposition in his workers' compensation action, Plaintiff testified that Masters "repeatedly told me that if I couldn't do my job they were going to fire me." Id. Exhibit H, Garrett Deposition at 22. This action was filed on October 24, 2005.

The Court concludes that Plaintiff's filing of his worker's compensation action in September, 2003; the Defendant's statements to him about his medical condition; and Plaintiff's awareness that his medical condition that was the basis for his termination and his workers' compensation claim, should have reasonably placed Plaintiff on notice that his termination in November, 2003, may give rise to a retaliatory discharge claim. With these undisputed facts and under Tennessee law, Plaintiff's reliance on the disputed "Anonymous" e-mail to excuse the filing of a timely action is not justifiable.

In Fahrner, the Tennessee Supreme Court acknowledged that the discovery rule on statute of limitations issue is different from equitable estoppel. "[W]e hold that the discovery rule and equitable estoppel have independent significance, meaning that [the Plaintiff] is entitled to have the trial court consider his equitable estoppel claim, despite the fact that [the Plaintiff] cannot succeed by virtue of the discovery rule." 48 S.W. 3d at 147. The Tennessee Supreme Court clearly stated

17

that: "'Equitable estoppel necessarily requires active conduct by a defendant, above and beyond the wrongdoing upon which the plaintiff's claim is filed, to prevent the plaintiff from suing in time.'" Id. (quoting Santa Maria v. Pacific Bell, 202 F.3d 1170, 1177 (9th Cir. 2000).

The only alleged misconduct by the Defendant is the disputed e-mail. The Court notes that, as in the statute of limitations discussion, the Defendant's agents clearly stated during the pendency of his worker's compensation action that Plaintiff's medical condition (that was the basis for the state court action) may result in his termination. Those disclosures are inconsistent with any theory of concealment. The collective circumstances before the disputed e-mail are inferentially consistent with the statements in the disputed e-mail. The availability of discovery in his 2003 state court action is also a relevant factor, given the availability of documents and discovery depositions of the principals in this disputed e-mail. While the e-mail, its origin and alleged alteration create factual disputes, the Court concludes that the Defendant's agents' other statements to Plaintiff about his medical condition and the pendency of Plaintiff's worker compensation action, undermine any bases for estoppel.

Thus, the Court concludes that the Defendant's motion for summary judgment (Docket Entry No. 12) should be granted.

An appropriate Order is filed herewith.

**ENTERED** this the _10th_ day of July, 2006.

WILLIAM J. HAYNES, JR.
United States District Judge

18